

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00077-CR
_____

JAMES WESLEY BROOKS JACKSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. 1283854R

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

O P I N I O N

For committing the brutal rape and murder of Jo Beth Marchand, a sixty-year-old, mentally challenged, and physically disabled woman, James Wesley Brooks Jackson was convicted of capital murder and sentenced to life in prison without the possibility of parole.[1] Jackson appeals, urging thirteen points of error.[2] Because (1) the evidence is legally sufficient to support Jackson's capital murder conviction, (2) the trial court did not abuse its discretion in finding that Jackson's oral and written confessions were voluntarily made, and (3) Jackson's Rule 403 objections present nothing for our review, we affirm the judgment of the trial court.

## I. The Evidence Was Sufficient to Support Jackson's Capital Murder Conviction

The offense of capital murder (TEX. PENAL CODE ANN. § 19.03 (West Supp. 2013)) incorporates all of the requirements of murder (TEX. PENAL CODE ANN. § 19.02 (West 2011)), but additionally requires proof of at least one of a number of factors that are enumerated in the statute. Here, the factor alleged in the indictment to increase the charge from murder to capital murder was that it was committed during the commission of one or more felonies. More

---

[1]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to Section 73.001 of the Texas Government Code. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Second Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]Jackson claims that the evidence was legally insufficient to establish capital murder, the trial court erred by overruling his motion to suppress statements Jackson provided to law enforcement, and the trial court abused its discretion (and therefore erred) in overruling his objections pursuant to Rule 403 of the Texas Rules of Civil Procedure to the admission of State's Exhibits 48 (a photograph of Marchand's body) and 49 (photographs of Marchand's body), State's Exhibit 44 (a photograph of a vase on which Jackson's fingerprints were found), and State's Exhibit 89 (a chair cushion cover which tested positive for blood).

Further, Jackson claims that the trial court erred by overruling his renewed motion to suppress and the admission of State's Exhibit 2 (an audio and video recording of Jackson's second statement to law enforcement), State's Exhibit 3 (an audio and video recording of Jackson's third statement to law enforcement), State's Exhibit 1 (an audio and video recording of Jackson's initial statement to law enforcement), and State's Exhibit 95 (a copy of Jackson's written statement to law enforcement).

specifically, the indictment alleges the commission of or attempted commission of a burglary and/or an aggravated sexual assault.

Jackson claims that the evidence was insufficient to prove capital murder, because there was no evidence of burglary. *See McFarland v. State*, 930 S.W.2d 99 (Tex. Crim. App. 1996); *Nash v. State*, 115 S.W.3d 136, 139–40 (Tex. App.—Texarkana 2003, pet. denied) (appellate court must always address challenges to sufficiency of evidence). In support of this contention, Jackson points out that there was no evidence of any forced entry into the apartment. Further, the door to the apartment was locked and had to be opened with a key. He thus contends there was no evidence of burglary, one of the two crimes on which the State based its capital murder indictment. Jackson further contends that he did not intend to harm Marchand and that he did not commit or attempt to commit aggravated sexual assault, maintaining he and the victim engaged in consensual sex.

While Jackson's sufficiency argument is restricted to one three-sentence paragraph, his assertions broadly implicate both the burglary and aggravated sexual assault elements of capital murder. Reading this argument most favorably to Jackson, one could further conclude that it presents a challenge to the element of intent to murder Marchand.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of capital murder beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal

3

sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

The initial paragraph of the indictment charged Jackson with capital murder for intentionally causing the death of Marchand by strangling her with a ligature in the course of committing or attempting to commit the offense of aggravated sexual assault. Paragraph two of the indictment charged Jackson with capital murder by the same manner and means in the course of committing or attempting to commit the offense of burglary.

The issues raised in this appeal require at least a minimal recitation of the evidence developed at trial.

On the morning of December 2, 2011, Sally Sloan of Guardianship Services[3] became concerned about Marchand's welfare when her repeated telephone calls to Marchand's cell

---

[3]Guardianship Services is an organization that provides volunteers to assist mentally challenged individuals with money management, among other things. Marchand was Sloan's client through that organization.

4

phone and landline went unanswered both that morning and the preceding evening. Because she was scheduled to make an out-of-town flight that morning, Sloan contacted Terri Byrd,[4] a close friend of Marchand, to check on her. After learning from the Twin Oaks Apartment manager that Marchand was not in her apartment, which was in disarray, Byrd and Lynda Tarwater[5] became extremely concerned and went to Marchand's apartment in an attempt to locate her. When the pair arrived, there were no signs of a break-in,[6] but the apartment, which smelled strongly of disinfectant, was not in its usual, tidy condition. The mattress for Marchand's bed was lying in the living room, the dining table was in front of the closet door in the bedroom, and the bedroom curtains had been yanked down. Marchand's purse, cell phone, home phone, DVD player, and money, typically kept by the bed, were missing.[7] When Tarwater located Marchand's partially nude body rolled up in a blanket in the closet, she immediately called the police.[8]

---

[4]Byrd is a social worker who was involved in a ministry called Beautiful Feet Ministries, where she befriended Marchand and became her caseworker.

[5]Tarwater is a criminal defense attorney who befriended Marchand approximately ten years prior to trial in this case when Tarwater did volunteer work at a homeless shelter where Marchand lived. Tarwater worked to help Marchand find housing.

[6]Marchand's apartment door was locked when Byrd and Tarwater arrived. There was no damage to the door frame or to the door handle. Marchand was a private person and did not let people into her apartment that she did not know. She had a habit of keeping the front door locked when she was inside the apartment. Even if she left the apartment and went outside to meet someone, she would lock the front door. Marchand did not own a vehicle and traveled by city bus. She only had a few close friends.

[7]Money stored in a Ziplock bag in the freezer was not taken.

[8]Tarwater testified that given Marchand's physical limitations, Marchand would not have been able to move the mattress and the dining table.

Dr. Marc A. Krouse, the Deputy Chief Medical Examiner in Tarrant County, determined after autopsy that the cause of Marchand's death was ligature strangulation by homicide. Significant pressure caused the neck injury, as Marchand's larynx was fractured. She was struck in the face hard enough that her cheek tissue was crushed against her teeth. There was a large area of bruising under the scalp, which is consistent with a head impact to a flat surface, such as a floor or a wall. There was a blunt-force injury to the left side of her head as well as to the front of her face. There were post-mortem chemical burns in the fold of the skin where the thigh meets the pelvis. A towel found with the body smelled of household cleaner.

Marchand also suffered genital injuries, including a superficial tear between the urethra and the vagina, bruising on the side of the vaginal opening, and a small tear and abrasion between the vagina and anus. These injuries, Krouse opined, are consistent with sexual assault. No evidence of seminal fluid was found.[9]

Fort Worth Police Department homicide detectives Daniel Paine and Jeremy Rhoden worked tirelessly to solve the case. There was no sign of a forced entry—the door lock was intact and there were no broken windows. All items missing from the apartment were documented. The apartment complex was canvassed for possible witnesses, but no leads were developed.[10] While there were numerous surveillance cameras in various locations throughout

---

[9]A chair cushion cover tested positive for blood, but not seminal fluid. A cutting from the cushion cover was also sent for DNA testing to the University of North Texas Health Science Center. The blanket found in the closet with Marchand was screened for seminal fluid and blood. No seminal fluid was found, but blood was detected.

[10]The Twin Oaks Apartment complex, where Marchand resided, consists of three buildings. Each building has a gate on the exterior wall of the building that requires a code to access the building. In order to enter the complex, a person must enter a specific code on the keypad at the gate. A six-foot, wrought-iron fence surrounds the entire

the interior of each building as well as on the exterior of the buildings, the video footage taken from these cameras was of extremely poor quality. Compounding these deficiencies, the camera located near Marchand's door had ceased to function. The detectives looked at every piece of evidence they could find, including checking pawn shops for the missing items as well as examining pawn records and telephone records. Having developed no leads in the case, the detectives waited for forensic test results.

In March 2012, the detectives developed a lead when they received laboratory results of fingerprints taken at the crime scene. As a result of the information supplied by the laboratory, Jackson became a suspect in the case. Jackson was arrested pursuant to a warrant on March 6. Paine interviewed Jackson on three separate occasions on March 6, the date of his arrest.[11] Following the last interview, Jackson dictated and signed a transcribed statement of the events that took place in Marchand's apartment on December 2.

Jackson's story, as told to Paine, was that as he went to visit John Harmon, who lives in the Twin Oaks Apartments,[12] he walked by an apartment on the second floor (belonging to Marchand) and noticed that the apartment door was open. After discerning that no one was in the apartment, Jackson entered to see what he could find. After having found some things he believed he could use, he put them up in a trash bag and placed the bag beside the door. Leaving the apartment with the door slightly ajar, he put a piece of paper in the door so he could tell if

complex. Marchand's apartment was approximately seven to eight blocks from Jackson's residence on St. Louis Street in Fort Worth.

[11]Audio/video recordings were made of each interview.

[12]Paine located and spoke with Harmon, who denied that Jackson was present at his apartment on the night of the offense.

anyone had returned to the apartment while he was gone. Jackson returned to Harmon's apartment and then ran an errand for Harmon. On returning from his errand, Jackson checked the door to Marchand's apartment, which was still ajar. Jackson then re-entered the apartment to search the bedroom when "a lady came back." When he saw the lady, he told her that he wanted to leave and that he made a mistake by coming into her apartment. Jackson then told an incredible story of how Marchand (whom he maintains appeared neither shocked nor frightened by his unexpected presence) made sexual advances toward him, culminating in consensual sexual relations between the two.

According to Jackson, following the alleged consensual sexual intercourse, he again told Marchand that he wanted to leave but Marchand, with her cell phone charger draped around her neck, blocked Jackson's exit when he tried to make his exit. Jackson stated that he grabbed the charger, causing her to stumble and fall to the floor. He then started pulling Marchand to the closet with the cell phone charger cord still wrapped around her neck. Marchand struggled and braced herself in the closet doorframe while Jackson continued to pull on the charger cord. Jackson was finally able to pull Marchand into the closet, breaking the charger in the process. Once she was in the closet, Jackson told Marchand that everything was going to be okay, that he was not going to hurt her, and that he was going to leave. Marchand was lying face down in the closet. He threw some clothes and a comforter on her, closed the closet door and pushed something in front of it. Then, using a towel, Jackson wiped down everything he touched in the apartment, gathered the bags by the door, including a trash bag, and left. He threw the trash bag

8

in the dumpster on the way out of the complex. As he was walking home, Jackson dismantled Marchand's cell phone and discarded the pieces.

Jackson stated in the interview that he thought Marchand was going to be alright.

To the extent Jackson alleges that the State failed to prove his intent to murder Marchand, we disagree. "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011). Marchand was badly beaten—her shirt was covered in blood, her head was slammed against a floor or wall, her nose was fractured, and she was strangled by a ligature. Krause testified that a ligature mark completely encircled Marchand's neck. Significant pressure was applied to the ligature—enough to collapse the internal vasculature of the neck and fracture part of the larynx. To cause death, the pressure must be applied continually for a minimum period of two minutes. This is plain evidence of intent to murder.

Next, Jackson contends that there is no evidence of capital murder. In order to comply with the allegations in the indictment, to establish that Jackson committed capital murder, the State had to prove that he intentionally murdered Marchand in the course of committing or attempting to commit either (1) burglary of Marchand's habitation or (2) aggravated sexual assault of Marchand. *See* TEX. PENAL CODE ANN. § 19.03(a)(2).

A person commits the offense of burglary if, without the effective consent of the owner, he enters a habitation and commits or attempts to commit a felony, theft, or an assault. TEX. PENAL CODE ANN. § 30.02(a)(3) (West 2011). In a capital murder prosecution, evidence may

9

establish the underlying felony of burglary by murder of the victim following the unlawful entry into the habitation. *Homan v. State*, 19 S.W.3d 847, 849 (Tex. Crim. App. 2000).

Jackson contests the burglary element of capital murder on the basis that there was no evidence of a forced entry into Marchand's apartment. Forced entry is not, however, an element of burglary; rather, burglary requires entry to be made without the effective consent of the owner. *See* TEX. PENAL CODE ANN. § 30.02 (West 2011); *Ellett v. State*, 607 S.W.2d 545, 549 (Tex. Crim. App. [Panel Op.] 1980). According to Jackson's own statement, he entered Marchand's apartment while she was not home (the door was ajar) to see what he could find, evidencing the intent to steal. After entering, he bagged up some items like towels, a t-shirt, socks, food, and rolled coins.

If Jackson's statement is taken at face value, Marchand could not have consented to his entry into her apartment because she was not there. Although the door was ajar, there was no evidence that Jackson was given Marchand's consent to enter her apartment. *See Evans v. State*, 677 S.W.2d 814, 818 (Tex. App.—Fort Worth 1984, no pet.) ("A person can make an unlawful entry by walking through an open door when the entry is without the owner's consent."); *Clark v. State*, 667 S.W.2d 906, 908 (Tex. App.—Dallas 1984, pet. ref'd) ("[A]n entry through an open door can constitute a burglary . . . if the building is not open to the public."). Further, lack of consent to entry in burglary prosecutions may be shown by circumstantial evidence. *Hathorn v. State*, 848 S.W.2d 101, 107 (Tex. Crim. App. 1992); *Mayfield v. State*, 188 S.W.3d 316, 319 (Tex. App.—Eastland 2006, pet. ref'd). Here, Jackson's statement that he made a mistake

10

coming into Marchand's apartment and that he was not going to take anything is further evidence that he lacked consent to enter.

Even if the jury disbelieved Jackson's statement regarding his means of entry into Marchand's apartment, it was entitled to conclude that the burglary had its origin as a home invasion. Jackson's statements indicate that he did not know Marchand. Jackson stated that he had seen Marchand (although he did not mention her by name) "coming from the store," commenting, "I might have helped this lady with some groceries. . . ." He further stated, "[I] didn't know exactly where she lived but I knew she had a little push cart coming up the elevator and she had some other bags with her. . . ." Jackson never mentioned Marchand by name in any of his three oral statements or in his written statement.

The evidence further shows that Marchand spoke with Sloan on the evening of December 1, and she was expecting Sloan's visit that evening because of the telephone call that Sloan had made to her earlier in which she informed Marchand that she would be stopping by the apartment to bring her money and a new bus pass. Sloan told Marchand that she was working late and would give her a call and let her know when she was coming, and Marchand replied affirmatively. When Sloan called Marchand at 8:00 p.m. to let her know she would be coming over and Marchand did not answer her landline, Sloan waited a few minutes and called her landline again. Sloan attempted to call Marchand a third time, but received no answer, and then attempted to contact Marchand a fourth time as she drove the short distance from her office to Marchand's apartment. When she arrived at Marchand's apartment, Sloan called Marchand yet

11

again from the apartment security gate, but received no answer. Having received no response to her numerous calls, Sloan decided to stop by in the morning.

From these facts, the jury could have reasonably concluded that Jackson forced his way into Marchand's apartment sometime between 6:00 p.m. and 8:00 p.m. on the evening of December 1 when Marchand responded to an expected knock on her door. There is ample evidence in the record to support the burglary element of Jackson's capital murder conviction.

In a capital murder prosecution, the evidence need only be sufficient to establish one of the underlying felonies in the indictment. *Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim. App. 1995); *McGregor v. State*, 394 S.W.3d 90, 110 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (if evidence is sufficient to establish elements of burglary, court need not determine whether evidence is also sufficient to establish elements of aggravated sexual assault). Therefore, because the evidence in this case establishes burglary, we need not examine whether there was sufficient evidence to show that Jackson either committed or attempted to commit aggravated sexual assault.[13]

## II. The Trial Court Did Not Abuse its Discretion in finding that Jackson's Oral and Written Statements Were Voluntarily Made

In his second, sixth, eighth, tenth, and twelfth points of error, Jackson claims (in five identically worded arguments) that the statements taken by Paine and Rhoden on the date of his

---

[13]Even so, we do not wish to leave the impression that the record supports Jackson's statement that he had consensual sex with Marchand. It does not. Marchand was badly beaten and strangled. This is strong evidence from which a jury could find that Marchand did not consent to sexual relations with Jackson. *See Swearingen v. State*, 101 S.W.3d 89, 92–96 (Tex. Crim. App. 2003) (where defendant went on lunch date with victim and she was next found dead, jury could properly infer that any sex was not consensual). In this case, there was evidence of a struggle in the apartment—the curtains were pulled down and the blinds were bent. Krouse's testimony that Marchand's genital injuries are consistent with sexual assault is further evidence that Marchand did not consent to sexual relations with Jackson.

arrest were taken in violation of Article 38.22 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West Supp. 2013). Because each of these arguments is identical and thus cumulative, we address them within the context of Jackson's motion to suppress evidence.[14]

Jackson filed a pretrial motion to suppress any oral or written statements made by him[15] claiming that any such statements were (1) involuntary because they were coerced, and (2) taken in the absence of an intelligent and knowing waiver of the right to counsel. The trial court overruled the motion to suppress on both bases. On appeal, Jackson complains that the

---

[14]In his second point of error, Jackson complains of the trial court's ruling on his pretrial motion to suppress the statements in question (State's pretrial Exhibits 1, 2, and 3 as well as his written statement, marked as State's Exhibit 95 at trial). In points of error six, eight, ten, and twelve, Jackson complains of the trial court's rulings on his renewed motion to suppress each of these statements at trial (State's Exhibits 1, 2, 3, and 95). The State urges this Court to ignore Jackson's point of error based on the trial court's denial of his pretrial motion to suppress. In support of this request, the State relies on Rule of Evidence 103(a)(1), which provides,

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
> . . . . When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections.

TEX. R. EVID. 103(a)(1). This Rule does not dispense with appellate review of pretrial suppression motions; instead, it merely serves to protect against waiver of such objections offered outside the presence of the jury when the same evidence is offered at trial.

The State urges the Court to overrule each of these points of error as inadequately briefed. Although Jackson's brief on the suppression issue is not a model of clarity, we decline to find waiver due to inadequate briefing. The State further urges the Court to overrule each of these points of error as forfeited at trial. This argument is based on Jackson's complaint regarding the recorded statements, in which defense counsel stated, "I would suggest to the Court that these police officers left my client with the impression that they were going to physically harm him in some way." The State claims this global objection preserved nothing. First, this remark was made at the pretrial hearing on Jackson's motion to suppress (which included any oral or written statement Jackson provided to law enforcement). Second, after expressing this concern, Jackson explained the basis for it in detail. Based on the trial court's findings of fact and conclusions of law, the court clearly understood and appreciated the basis for Jackson's complaints. The complaint was not forfeited at trial.

[15]Jackson's motion to suppress was entitled, "Motion to Suppress Defendant's Statement Pursuant to Jackson v. Denno." *See Jackson v. Denno*, 378 U.S. 368 (1964) (requiring hearing on question of voluntariness of confession where issue of voluntariness raised).

statements were not freely and voluntarily made without compulsion or persuasion and that he would not have given a statement if he had understood that he could terminate the interview.[16] We interpret Jackson's appellate brief as presenting only the issue of whether his statements were voluntarily made.[17]

We review a trial court's decision on a motion to suppress evidence by applying a bifurcated standard of review. *Graves v. State*, 307 S.W.3d 483, 489 (Tex. App.—Texarkana 2010, pet. ref'd); *Rogers v. State*, 291 S.W.3d 148, 151 (Tex. App.—Texarkana 2009, pet. ref'd). While we defer to the trial court on its determination of historical facts and credibility, we review de novo its application of the law and determination on questions not turning on credibility. *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d

---

[16]Jackson apparently contends that he did not know that he could terminate the interview and that he did not understand the warnings he was given. To the extent Jackson relies on these statements as points of error on appeal, such points of error were not properly raised in the trial court and were inadequately briefed on appeal. To preserve a complaint for appellate review, an appellant must have presented to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired. TEX. R. APP. P. 33.1(a)(1)(A). "Even constitutional errors may be waived by failure to object at trial." *Stitt v. State*, 102 S.W.3d 845, 848 (Tex. App.—Texarkana 2003, pet. ref'd) (citing *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990)); *see Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004). Because these complaints were not raised in the trial court, they cannot be considered on appeal. *See* TEX. R. APP. R. 33.1(a). These complaints are inadequately briefed on appeal, as Jackson fails to present legal analysis, argument, or citation to the record in support thereof. *See* TEX. R. APP. P. 38.1(i).

[17]Article 38.22 of the Texas Code of Criminal Procedure provides that "[i]n all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding in the absence of the jury as to whether the statement was made under voluntary conditions . . . ." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. Article 38.22 also provides that an oral or written statement taken from an accused as a result of custodial interrogation is not admissible as evidence against him in any criminal proceeding unless certain warnings have been provided to the accused. These warnings mirror those required by *Miranda*. *Miranda v. Arizona*, 384 U.S. 436 (1966); *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a)(1)–(5), § 3(a)(2). On appeal, Jackson does not explicitly contend that the statements were taken in the absence of an intelligent and knowing waiver of the right to counsel, an issue he raised in the trial court. Jackson's brief never mentions the pertinent sections of Article 38.22 on which he relies. To the extent that Jackson's brief could be interpreted to mean that he was questioned without warnings, such complaint was not properly preserved at trial and has not been adequately briefed on appeal. *See* TEX. R. APP. P. 33.1(a), 38.1(i). Although Jackson's brief discusses *Miranda* and the fact that its holding extends to custodial interrogations, there is no question (1) that Jackson was under arrest at the time his statements were given, (2) that he had been fully advised of his *Miranda* rights prior to each statement, and (3) that he acknowledged his understanding of those rights and agreed to voluntarily waive them.

14

85, 89 (Tex. Crim. App. 1997). We also afford deference to a trial court's "application of law to fact questions" if the resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89.

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion . . . ." TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). When considering whether a statement was voluntarily made, we look to the totality of the circumstances surrounding its acquisition. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). A confession is involuntary if circumstances show that the defendant's will was overborne by police coercion. *Id*. at 856. If the record shows that there was "official, coercive conduct of such a nature" that a statement from the defendant was "unlikely to have been the product of an essentially free and unconstrained choice by its maker," the defendant's will was overborne. *See Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).

Jackson provided four statements to law enforcement (three oral and one written) after he was arrested March 6, 2012, and charged with Marchand's murder. At the suppression hearing, he voiced concerns about police overreaching during the course of the initial interview, resulting in what he characterized as an involuntary confession.

After Jackson's arrest, he was transported to the homicide office interview room of the Fort Worth Police Department at approximately 9:30 a.m. Jackson's wrist handcuffs were removed, and he was placed in ankle shackles. Only Paine and Rhoden were present during the interview, which lasted approximately one hour. Prior to commencement of the initial

15

audio/video-recorded interview, Paine read Jackson his rights in accord with the dictates of *Miranda*[18] and Article 38.22 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2). After Jackson acknowledged his understanding of these rights, Jackson then read the waiver of rights himself and orally agreed to waive those rights.

Approximately ten minutes into the interview, Paine raised his voice at Jackson, followed by shouting at Jackson that he "beat her because she was worthless," because "she didn't deserve to live," and because "she was a piece of trash." Shortly after this outburst, Paine leaned into Jackson and screamed, "This is you, James. This is you. You killed her like that. You killed her like that. You. You did that. Like a piece of trash. Like she doesn't mean nothing to nobody." After Paine left the room, the interview was continued by Rhoden. When Jackson commented that they were trying to make him out to be cold and calculating, Rhoden slammed the table with his open palm, knocking off a glass of water and shouting, "Because you are. You are, James. You are cold and calculating. Because you're sitting here and you are making up stories trying to convince me that you are the innocent victim in all of this."

Following the initial interview, Jackson was asked if he would like some lunch. When Jackson indicated that he would, Paine brought him a hamburger, tater tots, and a soft drink, all of which Jackson was permitted to consume alone and uninterrupted in the interview room.

The second interview took place approximately six hours after the initial interview. This subsequent interview was conducted at the polygraph examiner's office in Dallas at

---

[18]*Miranda*, 384 U.S. at 444–45.

16

approximately 4:45 p.m. The approximate hour-long interview was recorded with only Paine and Jackson present, and Jackson leading much of the conversation.

Before commencing the second interview, Jackson was once again informed of his rights, acknowledged his understanding of those rights, and agreed to waive those rights. The interview, conducted by Paine, was quite civil.

Jackson requested the third interview with Paine, which was also conducted at the office of the polygraph examiner in Dallas.[19] Jackson was informed of his rights for a third time, acknowledged his understanding of those rights, and agreed to waive those rights. This interview was again quite civil and lasted about an hour. The majority of the interview consisted of Jackson speaking uninterruptedly to Paine. Jackson confessed to strangling Marchand but stated that he thought she would be okay. During the course of this statement, Jackson volunteered, "I understand that I could have stopped this interview at any time and asked for an attorney."

Jackson's written statement (dictated by Jackson to a stenographer, who then transcribed it) was made on conclusion of the third oral interview and was concluded at 10:16 p.m. on that same day—March 6, 2012. Once the statement had been completed and printed, Jackson was given the opportunity to review it and make any corrections he desired. Jackson made some changes to his statement, and it was retyped. After that, Jackson was given a second opportunity to review it and confirm the statement's accuracy.

---

[19]Jackson spoke with the polygraph examiner for about ninety minutes in a pre-test interview. Although that conversation was recorded, the recording was not offered as an exhibit at trial.

In accord with Article 38.22 of the Texas Code of Criminal Procedure, the trial court entered findings of fact and conclusions of law that specifically support its conclusion that Jackson's statements were made voluntarily.[20]  *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6. The trial court made the following findings and conclusions:

> [A]s a matter of fact and as a conclusion of law, I find the Defendant was advised of his 38.22 rights, his *Miranda* rights, was advised thoroughly multiple times of his right to remain silent, his right to counsel, his right to terminate the interview, and the other rights as provided by not only constitutionally but by Texas statute.
>
> I find as a matter of fact, conclude as a matter of law based not only on the assertion of two years of college, I found the Defendant to be intelligent and articulate not only in his responses but in his questions and his comments.  And I found he had the capability factually and intellectually of understanding his rights in making a free and voluntary waiver of those rights and that he did in fact freely and voluntarily waive his *Miranda* a/k/a 38.22 rights and understood what he was doing at the time.
>
> I do find as a matter of fact and conclude as a matter of law that the initial interview at 350 West Belknap bordered on the aggressive side, and I totally agree with the observations. . . . But during the aggressive interview . . . your client, remaining calm and focused, declared that "I think you're just try[ing] to coerce me into saying something, admitting something that I didn't do."  So he didn't seem to be a product of coercion but to stare in the face of alleged coercion and, quite frankly, didn't provide information.
>
> If it ended with the first interview, if he were being coerced, if what he was saying was not voluntary and if his comments weren't focused and freely considered, he would have given the information in the third interview in the first interview.  So I don't find he was subjected to coercion.  I found he held his ground.  Even though, I do find and conclude that the nature of the interview was aggressive.  It was double-teaming.  It got loud.  He was cut off in a tactical or rude form or any combination thereof.  But those tactics produced nothing of monumental importance.  Even though, there was incriminating information

---

[20]The trial court did not enter a separate order overruling Jackson's motion to suppress and stating its findings of fact and conclusions of law.  The trial court dictated its findings and conclusions to the court reporter at the end of the hearing on the motion to suppress. Numerous courts, including this Court, have held that a trial court complies with Article 38.22, Section 6 of the Texas Code of Criminal Procedure when it dictates its findings of fact and conclusions of law to the court reporter at the end of the hearing and those findings are transcribed and made a part of the record without objection. *See Murphy v. State*, 112 S.W.3d 592, 601 (Tex. Crim. App. 2003); *Blount v. State*, 64 S.W.3d 451, 457 (Tex. App.—Texarkana 2001, no pet.); *Lee v. State*, 964 S.W.2d 3, 11–12 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd).

elicited. It's not anything of the nature of what's in the written statements or what was in the interviews at what we'll just refer to as the Holden office.

I also note as a matter of fact, conclude as a matter of law that the second and third interviews were very calm, peaceful, collective. Your client did most of the talking, the Defendant. His responses seemed to be intelligent and voluntary and thought out, that at the time of the interview two -- Pretrial 2 and Pretrial 3, he was redundantly and repeatedly warned of his rights on the face of the video as is required by law, asked again if he understood and in fact . . . acknowledged that he still understood the waiver and still wished to waive . . . . And at the time of Pretrial 3 made it clear on the face of tape he asked to speak to the officers, not they asked to speak to him again. And they were accommodating his request.

And to give benefit to your position, I guess it is remotely possible that he did so because he didn't think he said enough to keep from being hurt, even though the interviews were over. That is always a psychological possibility. I do not find it a reasonable inference from the evidence based on the nature of his demeanor, the nature of his questions and comments.

. . . . I found that all of the interviews pass constitutional muster, even though the interview one stands alone. Had there been different results, different information and statements made, I think walked up on knocking on the door but the second two interviews totally dispelled any concern that might be inferred about his responses of whether they were voluntary.

So looking at the totality of the interviews particularly as to Pretrial 2 and 3 and then subsequent written statement . . . was further corroboration that nothing that happened at Holden's office was coerced or improperly influenced. And they also meet the statutory criteria to which you've objected across the board to all statements.

And so as a matter of fact and law, I find all statements are in compliance with 38.22. I find all statements pass *Jackson Denno* muster and, therefore, 38.23 muster. . . . And his demeanor, his articulation of words, his eye contact, his responses, and his emotional reaction are consistent with a person who is providing information and that they've chose to provide and not been coerced and or enticed into providing.

Therefore, your motion to suppress for all of those reasons based on facts and law and such other legal reasons as are proper in law and fact is going to be denied as to what is in evidence now as State's Pretrial 1, State's Pretrial 2, State's Pretrial 3, State's Pretrial 5, and State's Pretrial 6. Even though as a matter of legal requirement, State's Pretrial 5 is not signed and, therefore, is not admissible on independent grounds, but as far as for purposes of impeachment or other issues that could come up, I find no *Jackson Denno* violation. Therefore, it's available for that purpose.

The trial court is the sole judge of the credibility of the witnesses and the weight of their testimony. *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000). We will not disturb a trial court's finding that is supported by the record. *Garza v. State*, 213 S.W.3d 338, 346–47 (Tex. Crim. App. 2007). The trial court concluded, considering the totality of the circumstances, that Jackson's oral and written statements were voluntarily made. The record supports the trial court's finding that Jackson voluntarily made his oral and written statements. There is no abuse of discretion in the trial court's findings. As stated by the high criminal court in *Estrada v. State*, 313 S.W.3d 274, 297 (Tex. Crim. App. 2010) (quoting *Miranda*, 384 U.S. at 455, 457), "[T]he interrogation techniques employed in this case are not the type of brutal 'third-degree' techniques that would render a defendant's 'statements to have been involuntary in traditional terms.'" The trial court, thus, did not err in refusing to suppress Jackson's statements.

## III. Jackson's Rule 403 Objections Present Nothing for our Review

Jackson's remaining points of error (three, four, five, seven, nine, eleven, and thirteen) complain that the trial court erred in overruling his Rule 403 objections to the admission of specific items of evidence. *See* TEX. R. EVID. 403. For the reasons stated below, we find that each of these points of error has been forfeited on appeal due to inadequate briefing. *See* TEX. R. APP. P. 38.1(i).

In point of error three, Jackson complains that the trial court abused its discretion in overruling his Rule 403 objection to the admission of State's Exhibits 48 (a photograph of Marchand's body as it was found in the closet) and 49 (a photograph of a twisted and bent coat hanger on the shelf of the closet in which Marchand's body was found).

20

Jackson contends in his fourth point of error that the trial court abused its discretion in overruling his Rule 403 objection to State's Exhibit 44 (a photograph of a vase in Marchand's home on which Jackson's fingerprints were found). In his fifth point of error, Jackson complains of the trial court's abuse of discretion in overruling his Rule 403 objection to the admission of State's Exhibit 89 (the bottom of a blood-stained cushion cover found at Marchand's apartment). Jackson again complains of the trial court's failure to exclude evidence (State's Exhibit 1—the audio and video recording of Jackson's initial interview on the day of his arrest) pursuant to Rule 403 in his seventh point of error. Point of error nine complains of the trial court's failure to exclude State's Exhibit 2—the audio and video recording of Jackson's second interview on the day of his arrest, pursuant to Rule 403. In his eleventh point of error, Jackson complains of the trial court's failure to exclude State's Exhibit 3—the audio and video recording of Jackson's third interview on the day of his arrest, pursuant to Rule 403. In his final point of error, Jackson complains of the trial court's failure to exclude State's Exhibit 95—Jackson's written statement given on the date of his arrest, pursuant to Rule 403.

In each of these points of error (three, four, five, seven, nine, eleven, and thirteen), Jackson presents virtually the same bare-bones complaint, the gist of which is that the trial court failed to conduct a balancing test as is required by Rule 403 of the Texas Rules of Evidence prior to the admission of each of the various items into evidence. Although Jackson's brief includes and repeats a discussion of the legal requirements for the exclusion of evidence pursuant to Rule 403, the brief fails to include any analysis, argument, or citation to the record to support his contention that the trial court erred in failing to exclude the objected-to evidence. In each of

21

these points, Jackson's brief merely contends that "the court did not conduct a balancing test as is required by Rule 403" before allowing admission of the evidence of which Jackson complains. Because we are under no obligation to make Jackson's arguments for him, we find that these issues are inadequately briefed and that they present nothing for our review. *See* TEX. R. APP. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 2712 (2012); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008) (affirming that court has no obligation "to construct and compose" a party's "issues, facts, and arguments 'with appropriate citations to authorities and to the record.'").

We also point out that although the trial court neither voiced the fact that it was conducting a Rule 403 balancing test nor explicitly mentioned the elements of that test when overruling Jackson's objections to the introduction of the evidence to which he objected, we find nothing in the record that he refused to do so. In other words, "We find nothing in the record to indicate that the trial court did not perform a balancing test, albeit a cursory one." *Santellan v. State*, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997).

22

## IV. Conclusion

We affirm the judgment of the trial court.

Bailey C. Moseley
Justice

Date Submitted:    January 7, 2014
Date Decided:    February 4, 2014

Publish