

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00427-CR

_____

JOE LEE JAMES, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1610475R

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Opinion by Justice Wallach

**OPINION**

In this family-violence case, a jury found Appellant Joe Lee James guilty of two counts: (1) violating an emergency protective order by striking J.H. (Jane),[1] a person protected by the order, with his hand and (2) committing felony assault causing bodily injury to Jane, a woman with whom he had a dating relationship, by striking her with his hand. *See* Tex. Penal Code Ann. §§ 22.01(a)(1), (b)(2)(A), 25.07(a)(1), (b)(1), (c), (g)(2)(B); Tex. Code Crim. Proc. Ann. art. 17.292. After finding true the habitual-offender allegations regarding James's two prior felony-offense convictions, the trial court sentenced James to serve fifty years' confinement on each count, with the sentences to be served concurrently.

James raises two issues. In his first issue, he contends that the trial court abused its discretion by admitting extraneous-offense evidence under Code of Criminal Procedure Article 38.371 because the evidence was offered to show his character conformity, violating Rule of Evidence 404(b), and because the probative value of the evidence was substantially outweighed by a risk of one or more of the following: undue prejudice, confusing the issues, misleading the jury, undue delay, or the needless presentation of cumulative evidence, violating Rule of Evidence 403. He

---

[1]To protect Jane's anonymity, we use pseudonyms for her and for her sister, M.H. (Mary). *See McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

further contends that even if the evidence was admissible, the trial court abused its discretion by failing to conduct proper Rule 404 and Rule 403 analyses.

In his second issue, James contends that the trial court abused its discretion by allowing Mary Beth Kopsovich, the vice president of nonresidential services at Safe Haven, to testify as an expert because she was not qualified to do so and because her testimony about the cycle of violence was not relevant. We hold that the trial court did not abuse its discretion by admitting the challenged evidence or by allowing Kopsovich to testify as an expert; we therefore affirm the trial court's judgments.

## I. Background Facts[2]

At the root of these offenses is domestic violence. James and Jane began dating in 2017. Soon the relationship became abusive, and he abused her emotionally, verbally, physically, sexually, or in some combination thereof almost every day. On April 10, 2018, someone saw them together inside a Fort Worth restaurant. When James was not looking, Jane asked the person for help. That person followed them from the restaurant and called 911 to report Jane's request for assistance, James's and Jane's physical descriptions, and the description of the vehicle in which they had left. The responding Fort Worth Police Department (FWPD) officers found the couple outside a nearby store. Jane told the police that James had abused her that day, and

---

[2]Because James does not challenge the sufficiency of the evidence to support his convictions, we omit a more detailed factual background and will set forth additional facts as necessary in our discussion of his issues.

they arrested him. She obtained an emergency protective order on April 11, 2018. However, James was released from jail the next day, April 12, 2018.

On that day, James found Jane at a crack house, forced her to leave with him, and threatened to kill her for reporting his abuse to the police. James abused Jane verbally, physically, and sexually over the next two days. The verbal abuse included more threats to kill her. The physical abuse included hitting her in the face and head with his hands and fists and hitting her legs with sticks. The sexual abuse included two acts of anal rape.

On the evening of April 13, 2018, James and Jane went to a convenience store. While there, Jane let another shopper know that she needed help and asked him to call the police after she left the store. He contacted the police after Jane left the store and followed James and Jane for a short distance. The responding police found James and Jane in a nearby park.

James and Jane both initially told the police that everything was fine, but Jane ultimately let the officer know that she needed help. In her conversation with police, she described the abuse that had occurred that day. The police arrested James, and a grand jury later indicted him with violating the emergency protective order and with felony assault bodily injury of Jane, a person with whom he had a dating relationship. The underlying assault named in both offenses was James's striking Jane with his hand on or about April 13, 2018.

The State gave notice that it intended to introduce evidence at trial of the couple's relationship, including Jane's testimony about James's controlling her in the relationship; the physical and sexual abuse throughout it, including his tying her up; their drug use; and his forcing her to steal to pay for drugs. The State also sought to introduce evidence of the following specific incidents:

- January 8, 2018: James injured Jane by busting her lip and hitting her head, resulting in a hospital visit;

- January 13, 2018: James sexually assaulted Jane with a broom, resulting in a hospital visit;

- January 21, 2018: James attempted to break into Jane's sister's home;

- February 10, 2018: Jane attempted to commit suicide and later the same day tried to obtain help from a police officer;

- April 10, 2018: James was arrested for assaulting Jane, resulting in the issuance of an emergency protective order;

- April 13, 2018: in addition to the assault alleged in the indictment, James sexually assaulted Jane.

In a pretrial hearing, James objected to the admission of the evidence under Rules of Evidence 403 and 404. The trial court determined that the evidence was admissible and granted James a running objection. During trial, the trial court admitted the proffered evidence over James's objections. However, the trial court also issued a limiting instruction to the jury before the jury heard any of the extraneous-offense evidence:

> You are instructed that if there is any testimony before you in this case regarding other crimes, wrongs, or acts committed by [James] against [Jane], you cannot consider that testimony for any purpose unless you

5

find and believe beyond a reasonable doubt that [James] committed such crimes, wrongs, or acts against [her], and then you may only consider that testimony for the purpose of its bearing, if any, on the state of mind of [James] and [of Jane] and the[ir] previous and subsequent relationship . . . .

The trial court included a similar limiting instruction in the written jury charge.[3]

In addition to the extraneous-offense evidence, the State sought to introduce expert testimony. During the trial, the State called Kopsovich to testify as an expert on the dynamics of domestic violence and to opine about the risk and level of lethality in the relationship between James and Jane. After a Rule 705 hearing, James objected that Kopsovich was not qualified to testify as an expert, that her testimony was not relevant, and that her testimony was inadmissible under Rule 403. The trial court overruled his objections in part, ruling that Kopsovich could testify as an expert about the cycle of violence and related power-and-control wheel[4] but could not opine on the

---

[3]The limiting instruction in the jury charge provided,

You are instructed that if there is any testimony before you in this case regarding [James] having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that [he] committed such other offenses, if any were committed, and even then you may only consider the same in determining the state of mind of [James] and [Jane]; and the previous and subsequent relationship between the[m], if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

[4]The power-and-control wheel is an educational tool used by domestic-abuse counselors to help explain the domestic-abuse cycle. *See Fernandez v. State*, No. 02-18-

6

risk or level of lethality in James and Jane's relationship. At trial, Kopsovich testified generally about domestic violence and more specifically about the cycle of violence, involving a tension phase, explosion phase, and honeymoon phase, and the power-and-control wheel, which showed different ways in which an abuser uses and maintains power and control over the person abused.

## II. Discussion

In both issues, James complains of the admission of evidence.

### A. Standard of Review

We review the trial court's admission of evidence for an abuse of discretion, which the record shows only when the ruling falls outside the zone of reasonable disagreement. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006); *Merrick v. State*, 567 S.W.3d 359, 375 (Tex. App.—Fort Worth 2018, pet. ref'd). We also review a trial court's ruling on an expert's qualifications for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Rodgers v. State*, 205 S.W.3d 525, 527–28 (Tex. Crim. App. 2006). We will uphold the trial court's correct decision under any applicable legal theory even if the trial court gave a wrong or incomplete reason for its ruling. *De la Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *Qualls v. State*, 547 S.W.3d 663, 675 (Tex. App.—Fort Worth 2018, pet. ref'd).

---

00483-CR, 2020 WL 1057323, at *2 (Tex. App.—Fort Worth Mar. 5, 2020, pet. filed) (mem. op., not designated for publication).

## B. Admissibility of Evidence of Extraneous Offenses

In his first issue, James complains about the trial court's admission of the State's evidence proffered under Article 38.371 of the Code of Criminal Procedure.

### 1. The Extraneous Offense Evidence Admitted

James complains about the admission of evidence of extraneous offenses including physical assaults against Jane other than the assault charged in the instant offenses, criminal mischief, thefts, illegal drug possession, burglary of a habitation, aggravated kidnapping, and aggravated sexual assaults as well as testimony that he emotionally and verbally abused Jane, forced her to use crack cocaine and to steal to support their drug habit, and tormented her so much that she attempted suicide. The evidence about which he complains is detailed in his statement of facts and in the State's response to his first issue. Specifically, the jury heard extraneous-offense evidence from the following witnesses:

### a. Mary

Mary, Jane's sister, testified that Jane and James stayed with her early in their relationship.[5] Although Mary never saw James hit Jane and never saw any bruises, Mary did hear and see signs of abuse, including noises that sounded like body-slams, Jane's crying, and "maybe like redness" on Jane's dark skin.

---

[5]The evidence showed that Jane was homeless.

On January 21, 2018, James was angry and went to Mary's home to talk to Jane. The women would not let him in, so he tried to force his way into the home, breaking the front door. Mary called the police.[6] The women had moved furniture to block that entry, so James went to the back of the house and broke a window. James left before the police arrived.

That same day, Mary had seen Jane in the couple's bedroom with her hands tied behind her back and with her feet bound. Mary did not report this fact to the police because she "only told them what" Jane had "told her to say."

### b. FWPD Officer Dispatched to Mary's Home on January 21, 2018

FWPD Officer Dana Atkins went to Mary's home on January 21, 2018, in response to the 911 calls. Officer Atkins remembered (after reviewing her report) that a door had been damaged; that Mary, Jane, and Mary's minor daughter had been present; and that the detective in charge had ultimately mailed the absent James a ticket as a result of his reported conduct.

### c. FWPD Officer That Jane Encountered on February 10, 2018, at a Gas Station

FWPD Officer Jeril Landry encountered Jane inside a QuikTrip gas station on February 10, 2018, at the end of his shift. He testified that Jane flagged him down and told him that someone was following her. Officer Landry believed that Jane was trying to ask for help "without making it obviously super apparent to everybody

---

[6]A recording of Mary's two 911 calls to the FWPD regarding this incident was admitted into evidence after defense counsel stated, "No objection."

around that she needed help." She appeared very odd, with a strange demeanor, and was standoffish, like she was under duress and could not speak freely. He thought at the time that she could possibly be under the influence of drugs. Officer Landry and Jane went outside to his police car, where she told him that her significant other was following her around and "not letting her [be] free to do what she wanted to do." Officer Landry called for backup, but he was not able to locate James after backup arrived. The arriving officers took over the case, and Jane, who appeared scared to leave the gas station by herself, was transported to a nearby location.

### d. FWPD Officer Who Helped Jane Obtain the Emergency Protective Order

FWPD Officer Natasha Bender testified that on April 10, 2018, she was dispatched to a local restaurant on a domestic assault call. She did not find James and Jane in the restaurant but found them at a nearby store. Jane seemed upset and scared. After speaking to Jane, Officer Bender determined that James had assaulted Jane by punching her in the temple multiple times. Although Officer Bender did not recall seeing injuries on Jane, the officer noted that the temple does not always reveal bruising. Officer Bender helped Jane fill out a family violence packet and filled out an application for an emergency protective order on Jane's behalf to protect her from James. The emergency protective order, signed the next day by a magistrate, prohibited James from communicating with Jane or going within 500 feet of her residence for approximately two months.

## e. Jane

Jane testified about her relationship with James, the specific instances of abuse discussed by other witnesses, and the circumstances leading up to the charged offenses. She explained that she met James in 2017, and they began dating shortly after meeting. The relationship started off well, but James soon became angry, jealous, and abusive.

Jane testified that James was verbally, emotionally, physically, and sexually abusive. He first physically abused her outside his cousin's apartment one to three months after they began dating. In that first incident, James hit her several times, body-slammed her, and hit her head on a vehicle. The security guard called the police, but Jane told the police that James did not do anything because she cared about him. James left Jane with his truck and went to stay with his child's mother for a couple of days. Jane remained with the truck and remained in the relationship.

Jane testified that the violence in their relationship escalated from that first assault. James forced Jane to engage in sexual acts with him against her will. He was verbally and emotionally abusive every day, putting her down and often threatening to kill her, and the physical abuse continued daily as well. He would hit her with his hands. Jane stated that the physical abuse did not always leave marks, but it often did.

Jane testified that James introduced her to crack cocaine and encouraged her to use it. She became addicted, and they used crack cocaine together every day. James made her steal things so they could sell the items for drugs or whatever else he

decided to spend the money on. Jane also indicated that James would not let her have a phone except for noticeably short periods when he sent her on drug buys, would isolate her from her family, and beginning about five months into the relationship, would tie her legs together at night so she could not leave him.

Jane testified about some specific incidents of abuse. Once, James sexually and physically assaulted her after accusing her of having sex with a drug dealer. On another occasion, James busted her lip and hit her in the head, causing a contusion. Jane went to the hospital on January 8, 2018, for treatment for those injuries. However, James remained by her side at the hospital. Jane told the doctor that she had sustained her injuries in a fight with random people. She did not want to tell the doctor that James had injured her because he was present during the conversation and she was scared.

Within a week, Jane went to the hospital again. This time, she had a yeast infection and vaginal bruising caused by James's forcing her to penetrate herself vaginally with a broom as punishment. Jane did not tell hospital personnel about the abuse because she wanted to protect James.

Jane also testified about the January 21, 2018 incident in which James attempted to break into her sister's home. The couple had begun arguing while donating plasma nearby. Jane then ran to Mary's home, and he followed. He repeatedly threatened to kill Jane if she did not let him in. Jane testified that she did not let James in because she was afraid. She stated that James broke the front door

and back window. Jane believed the case just subsided because she "never went ahead and pushed anything through or forward."

On February 10, 2018, James verbally and physically abused Jane again. Because of the emotional toll the abusive relationship had taken on her, Jane took a bottle of Benadryl pills. An ambulance transported her to the hospital due to her suicide attempt, but she was released that same day. After her release, the couple went to Mary's home. Jane admitted that she was then "talking crazy" and "making no sense."

That evening, Jane and James left Mary's home and walked to a nearby QuikTrip. James had been very mad and had threatened to kill Jane. She ran around inside the store, trying to avoid him. She finally ran outside, saw Officer Landry, and asked him for help. James left while Jane was talking to the police officer, so the police took her to a safe location. At trial, Jane could not remember whether the police took her to Safe Haven or her sister's home.

Jane next discussed the incident that occurred on April 10, 2018, and that prompted the emergency protective order. She and James went to a local restaurant to sell some stolen items. While there, Jane whispered to a woman she recognized from previous visits that she needed help but then left with James. The woman called the police. The police found the couple at a store nearby. This time, James stayed when police arrived. Instead of protecting James like she had in the past, Jane told the police about the abuse James had inflicted on her. Jane testified that she told the truth

13

because the violence had escalated, she was scared, and she wanted to get away from James but could not. The police arrested James that night, Jane went to Safe Haven, and she obtained an emergency protective order against him the next day, April 11, 2018. Jane did not believe that the protective order would really protect her from James, and she was correct.

Jane explained that James was released from jail on April 12, 2018, and that she heard about his release from people in the neighborhood. His release concerned her. That same day, he found her smoking crack at a crack house and led her out. Other people were present at the crack house; there was no evidence in the record that James had a weapon. However, Jane testified that by "charg[ing]" her and by telling her that he would kill her if she did not leave with him, James forced her to leave the crack house with him. Jane testified that James repeatedly told her that he was going to kill her that day because she was responsible for his going to jail, and she further testified that he sexually and physically assaulted her numerous times throughout that day.

The death threats, physical abuse, and sexual abuse continued the next day, April 13, 2018. Jane specifically stated that James hit her in the head and face with his hands and fists, and he hit her in the legs with a stick. Jane also stated that James anally raped her twice.

That night, they went to a 7-Eleven because James wanted Jane to steal him a beer. While there, in addition to stealing a beer for James, Jane surreptitiously let

another shopper know that she needed help and asked him to call the police but to wait until after she left the store. The shopper contacted the police, who found the couple in a park behind the 7-Eleven. The police asked James and Jane if they were okay. They both said yes, but afterward, when James was not looking, Jane signaled to the officer that she needed help.

The police separated James and Jane to further investigate. In Jane's conversation with police, she described the abuse she had endured. She testified that she told the police the truth because she believed that James was going to kill her that night, that she was really in danger, and that she needed to get away from him but could not. The police ultimately arrested James.

## 2. Admissibility under Rule 404(b) and Article 38.371

In a pretrial hearing, the trial court determined that the extraneous-offense evidence detailed above was admissible under Article 38.371 because "the statute specifically allows any testimony regarding the nature of the relationship between the actor and the alleged victim" and "all of the [extraneous] acts [proffered by the State] are between the accused and the alleged injured party." The trial court later admitted the evidence during trial over James's objections but gave an oral limiting instruction before admitting it and a written limiting instruction in the guilt-innocence jury charge.

On appeal, James argues that the trial court abused its discretion by admitting the extraneous-offense evidence because it was offered to show that he acted in

15

conformity with his character, in violation of Rule 404(b). *See* Tex. Code Crim. Proc. Ann. art. 38.371(b); Tex. R. Evid. 404(b). Rule 404(b) of the Texas Rules of Evidence limits character evidence, but it is nevertheless a rule of inclusion. Tex. R. Evid. 404(b); *De La Paz*, 279 S.W.3d at 343; *Nash v. State*, No. 02-17-00236-CR, 2018 WL 4495440, at *6 (Tex. App.—Fort Worth Sept. 20, 2018, pet. ref'd) (mem. op., not designated for publication). Rule 404(b) precludes the admission of evidence of a crime, wrong, or act solely to prove a person's character to show that he acted in conformity with that character on a particular occasion, but the rule allows for such evidence to be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Tex. R. Evid. 404(b)(2). Those listed purposes "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343.

Article 38.371, which applies to family-violence prosecutions, provides another non-character-conformity purpose for admitting extraneous-offense evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.371. Although the statute explicitly prohibits the admission of character evidence that is otherwise prohibited by the Rules of Evidence or other laws, it expressly allows "evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense . . . , including testimony or evidence regarding the nature of the relationship" between the accused and the complainant. *Id.* art. 38.371(b), (c). Thus, Article 38.371(b) expressly allows extraneous-offense evidence regarding the nature of the

relationship between an accused and a complainant. *Mourning v. State*, No. 02-19-00168-CR, 2020 WL 6165309, at \*4–5 (Tex. App.—Fort Worth Oct. 22, 2020, no pet.) (mem. op., not designated for publication); *Franco v. State*, No. 08-18-00040-CR, 2020 WL 3168560, at \*8 (Tex. App.—El Paso June 15, 2020, no pet.) (not designated for publication) ("[T]he Legislature has determined under article 38.371 that the nature of the relationship itself is a permissible, non-character-conformity purpose for which evidence is admissible.") (citing Tex. Code Crim. Proc. Ann. art. 38.371(b); Tex. R. Evid. 404(b)(2); *Fernandez v. State*, 597 S.W.3d 546, 564–66 (Tex. App.—El Paso 2020, pet. ref'd)).

All the extraneous-offense evidence James complains of shows the nature of his relationship with Jane and was admissible under Article 38.371(b) and Rule 404(b) on that basis. Thus, we hold that the evidence was admissible for the same reason the trial court ruled it admissible—it concerned James and Jane's relationship, a purpose that is not character conformity. *See* Tex. Code Crim. Proc. Ann. art. 38.371(b); Tex. R. Evid. 404(b); *Mourning*, 2020 WL 6165309, at \*4–5; *Franco*, 2020 WL 3168560, at \*8; *Fernandez*, 597 S.W.3d at 564–66.[7]

---

[7]James contends that he did not raise a defensive theory that would justify the admission of the State's proffered extraneous bad-act evidence. While we disagree—James's defensive theory was that Jane lied about the abuse to the police and at trial, as seen in our discussion of his Rule 403 complaint below—we do not further address that contention in our Rule 404(b) discussion, given our disposition upholding the trial court's admissibility ruling on the ground that the challenged evidence shows the nature of the couple's relationship. *See* Tex. Code Crim. Proc. Ann. art. 38.371(b); Tex. R. Evid. 404(b); Tex. R. App. P. 47.1.

### 3. Propriety of Trial Court's 404(b) Analysis

James further argues that even if the evidence was admissible, the trial court did not conduct a proper analysis under Rule 404. We reject this argument. The trial court's ruling tracks Article 38.371, which governs trials involving family-violence offenses, explicitly references the Rules of Evidence, and implicitly references Rule 404. *See* Tex. Code Crim. Proc. Ann. art. 38.371. Further, while we have authority to uphold the trial court's ruling on any correct legal basis, *see De La Paz*, 279 S.W.3d at 344, we have upheld it on the explicit ground cited by the trial court. We therefore hold that the trial court's analysis was proper.

### 4. Admissibility under Rule 403

James also argues within his first issue that even if the extraneous-offense evidence is admissible under Rule 404(b), Rule 403 precludes its admission. Tex. R. Evid. 403; *see* Tex. Code Crim. Proc. Ann. art 38.371(b). Evidence admissible under Rule 404(b) may nevertheless be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403; *see Emich v. State*, No. 02-18-00059-CR, 2019 WL 311153, at *7 (Tex. App.—Fort Worth Jan. 24, 2019, no pet.) (mem. op., not designated for publication). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990) (op. on

18

reh'g); *Emich*, 2019 WL 311153, at *7. It is the burden of the party opposing the admission of the evidence to overcome this presumption by showing that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or by the other dangers listed in Rule 403. *Wells v. State*, 558 S.W.3d 661, 669 (Tex. App.—Fort Worth 2017, pet. ref'd); *Sanders v. State*, 255 S.W.3d 754, 760 (Tex. App.—Fort Worth 2008, pet. ref'd).

When considering if evidence is admissible despite a Rule 403 objection, the trial court must conduct a balancing test. *Montgomery*, 810 S.W.2d at 389. In conducting the balancing test, a court must consider (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence and balance those factors against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *Alami v. State*, 333 S.W.3d 881, 889 (Tex. App.—Fort Worth 2011, no pet.).

### a. The Evidence's Probative Force and the State's Need for the Evidence

The first two *Gigliobianco* factors assess "probative value," Rule 403's "first key phrase." 210 S.W.3d at 641. Probative value pairs "the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation . . . with the proponent's need for that item of evidence." *Id.* When the State has "other compelling or undisputed evidence to establish" what the extraneous-offense evidence "goes to prove," the value of the extraneous-offense evidence is much less. *Id.* (internal quotation marks omitted) (relying on *Montgomery*, 810 S.W.2d at 390).

James contends that the probative value of the extraneous-offense evidence was limited. Relying on *Payne v. State*, No. 02-17-00268-CR, 2019 WL 2223575, at *2 (Tex. App.—Fort Worth May 23, 2019, no pet.) (mem. op., not designated for publication), he argues that in determining the extraneous-offense evidence's probative value, a court must look at the similarities between the extraneous offenses and the charged offense. He implicitly argues that some of the extraneous offenses— rape, sodomy, torture, and unlawful restraint—are too different from the "simple assault" with which he was charged to be of much probative value. We did not address the impact of dissimilar offenses in *Payne*. *See id.* What we actually stated in *Payne* is that "[p]robative value considers 'the closeness in time between the extraneous offense and the charged offense' and 'the similarities between the

extraneous offense and the charged offense."' *Id.* (quoting *Kiser v. State*, 893 S.W.2d 277, 281 (Tex. App.—Houston [1st Dist.] 1995, pets. ref'd)).

In this case, the timing of the offenses is key. The specific evidence of rape, sodomy, torture, and unlawful restraint that James emphasizes—and most of the other extraneous-offense evidence—concerns acts that occurred during a period of less than four months that culminated in James's April 13, 2018 arrest. That evidence therefore had probative value as to his intent to commit the charged offenses. *See Robinson v. State*, 701 S.W.2d 895, 898–99 (Tex. Crim. App. 1985), *Flores v. State*, No. 03-19-00489-CR, 2020 WL 3887976, at *4 (Tex. App.—Austin July 9, 2020, no pet.) (mem. op., not designated for publication); *Felipe v. State*, No. 03-19-00508-CR, 2020 WL 3887974, at *5 (Tex. App.—Austin July 8, 2020, no pet.) (mem. op., not designated for publication). Also, the extraneous-offense evidence was probative of the nature of James's abusive relationship with Jane, showing the patterns of abuse and the power and control that he had over her. Evidence of James's patterns of abuse of Jane helped the jury understand why she left the crack house with him, why she remained with him April 12 and April 13, why she stole a beer for him on the evening of April 13, and why her first reaction when the police arrived that evening was to say that she was fine. *See Emich*, 2019 WL 311153, at *7.

Finally, the extraneous-offense evidence was also probative to rebut the defensive theory of fabrication. Defense counsel built the groundwork for the theory during voir dire, when he talked about judging witness credibility and assessing

21

motivation. In the defense's opening statement, defense counsel indicated that the case was going to be about Jane's credibility. He stated that no physical evidence corroborated the "stories . . . from [Jane] and her sister" and there was no evidence of physical injuries from the charged offenses. He conceded that "[t]he protective order violation happened" but contended that it happened because James could not "get away" from Jane. Defense counsel told the jury that Jane knew that any time the police were called, James would go to jail, not her, even when she was caught stealing. He also told the jury to "remember motivation bias for why" witnesses testify.

As the State points out, evidence of prior assaults and abuse makes it less likely that a complainant has fabricated the charged offenses. *Foster v. State*, No. 01-17-00537-CR, 2018 WL 1914871, at *5 (Tex. App.—Houston [1st Dist.] Apr. 24, 2018, pet. ref'd) (mem. op., not designated for publication); *Martin v. State*, Nos. 02-07-308-CR, 02-07-309-CR, 02-07-310-CR, 02-07-311-CR, 02-07-312-CR, 02-07-313-CR, 02-07-314-CR, 02-07-315-CR, 02-07-316-CR, 2008 WL 4831345, at *12–13 (Tex. App.—Fort Worth Nov. 6, 2008, pet. ref'd) (mem. op., not designated for publication). Therefore, the evidence of James's prior assaults and abuse against Jane showed the jury that it was less likely that she fabricated the charged offenses.

For all these reasons, we hold that the probative value of the extraneous-offense evidence was strong. *See Foster*, 2018 WL 1914871, at *5; *Martin*, 2008 WL 4831345, at *12–13.

The State also had a strong need for the extraneous-offense evidence because no one witnessed the charged offenses, Jane had no evident injuries, and her credibility was at issue. *See Emich*, 2019 WL 311153, at *7; *Sarabia v. State*, 227 S.W.3d 320, 324 (Tex. App.—Fort Worth 2007, pet. ref'd) (concluding, in case involving aggravated sexual assault of a child, that the State's need to show the jury the defendant's pornographic photographs of children was high because no one witnessed the assault, there was no DNA or physical evidence from the assault, the defense had challenged the complainant's credibility, and besides the photographs, the State had only the complainant's testimony with which to meet that challenge). In the absence of any witnesses to the charged offenses, the extraneous-offense evidence rebutted the fabrication defense and supported the State's allegations that James was responsible for the protective-order violation and that he hit Jane.

These two factors weigh in favor of admission.

**b. Tendency of the Evidence to Suggest a Decision on an Improper Basis**

The third *Gigliobianco* factor concerns Rule 403's "second key phrase, 'unfair prejudice.'" 210 S.W.3d at 641. Unfair prejudice "refers to a tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* Evidence is not excludable under Rule 403 if it is merely prejudicial; "all evidence against a defendant is . . . designed to be prejudicial." *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013); *see* Tex. R. Evid. 403. Rule 403 is concerned not with

prejudicial evidence but with evidence that is unfairly prejudicial. Tex. R. Evid. 403; *Pawlak*, 420 S.W.3d at 811.

James contends that the extraneous-offense evidence was extremely prejudicial. He relies only on *Payne*, in which this court determined that evidence of prior, similar assaults to the charged offense was "necessarily prejudicial" but "not unfairly so." 2019 WL 2223575, at *2. James posits that in the case before us, the seriousness of some of the extraneous offenses—rape, sodomy, torture, and unlawful restraint—as compared to the "simple assault" with which he was charged and on which the protective order violation was based shows that the extraneous-offense evidence is "undoubtedly extremely prejudicial." James cites no cases that directly stand for that proposition. Nevertheless, in the interest of justice, we recognize that the trial court could have reasonably determined that the evidence that James raped, sodomized, tortured, and unlawfully restrained Jane could have tended to suggest verdicts on the charged offenses on the improper basis of character conformity. *See Flores*, 2020 WL 3887976, at *4.

When evidence does tend to suggest a decision on an improper basis, however, a limiting instruction can minimize the risk of the jury improperly relying on it in reaching its verdict. *Id.*; *Norwood v. State*, No. 03-13-00230-CR, 2014 WL 4058820, at *5 (Tex. App.—Austin Aug. 15, 2014, pet. ref'd) (mem. op., not designated for publication). The trial court gave a limiting instruction before the extraneous-offense evidence was admitted and again in the jury charge. In the instructions, the trial court

informed the jury that it could consider the extraneous-offense evidence only if the jury determined beyond a reasonable doubt that James had committed the prior offenses and then only to determine James's and Jane's mental states and their relationship, if any, in connection with the charged offenses. We presume that the jury followed the trial court's limiting instructions. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Flores*, 2020 WL 3887976, at *4; *Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd). James does not attempt to rebut this presumption. *See Thrift*, 176 S.W.3d at 224.

James also does not raise any specific challenge to the prejudice arising from the admission of the extraneous-offense evidence that is similar in nature and seriousness to his charged offenses, such as the evidence that he hit Jane in the head in January 2018 and caused a contusion. Such a challenge would fail because that evidence, while prejudicial, was not unfairly so. *See Payne*, 2019 WL 2223575, at *2; *Norwood*, 2014 WL 4058820, at *5.

Accordingly, we hold that this third factor weighs in favor of admission of the extraneous-offense evidence that is not more heinous than the charged offenses. As to the evidence concerning James's raping, sodomizing, torturing, and unlawfully restraining Jane, we hold that the factor weighs against admission, but only moderately, given the impact of the two limiting instructions.

### c. Tendency of the Evidence to Confuse or Mislead the Jury

*Gigliobianco*'s fourth factor addresses Rule 403's "third key phrase, 'confusion of the issues.'" 210 S.W.3d at 641. Confusion of the issues alludes to the likelihood that the evidence would confuse the jury or distract them from the case's central issues. *Id.* "Evidence that consumes an inordinate amount of time to present . . . might tend to confuse or distract the jury from the main issues." *Id.*

James summarily concludes that the challenged evidence had the potential to confuse the issues. While he does complain that the State "inundated" the jury with extraneous-offense testimony for most of the trial, and he does discuss the number of witnesses and the fact that most of the extraneous-offense evidence was admitted before Jane testified, he has failed to include any analysis or argument to connect those facts to his conclusion. We decline to make his arguments for him. *See Jackson v. State*, 424 S.W.3d 140, 155 (Tex. App.—Texarkana 2014, pet. ref'd); *see also* Tex. R. App. P. 38.1(i).

The State contends that the extraneous-offense evidence did not confuse or distract the jury from the main issues in this case but instead presented the jury with a more complete picture of the cycle of violence between James and Jane, helping the jury understand Jane's behavior on the day of the offense. We agree. *See Emich*, 2019 WL 311153, at *7. Moreover, James was arraigned on the charges in the jury's presence; the trial court issued oral and written limiting instructions prescribing how the jury should use the extraneous-offense evidence, if at all; and the jury charge and

verdict forms made clear that the jury's job was to determine whether James was guilty or not guilty of the charged offenses. We therefore hold that this factor weighs in favor of admission.

*Gigliobianco*'s fifth factor focuses on Rule 403's "fourth key phrase, 'misleading the jury.'" 210 S.W.3d at 641. This factor involves the likelihood that a jury will place too much weight on the evidence for some reason not involving emotion. *Id.* "For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Id.*

James contends that the extraneous-offense evidence had the tendency to mislead the jury. However, he does not tell us why. He has failed to include any record citations, analysis, or argument to support his contention. Again, we decline to make his arguments for him. *See Jackson*, 424 S.W.3d at 155; *see also* Tex. R. App. P. 38.1(i).

The State argues that the extraneous-offense evidence was not the type of evidence to mislead the jury. Our review of the record shows that the extraneous-offense testimony was from lay witnesses, not experts, and it described the various abusive incidents in a factual manner. None of the extraneous-offense evidence was scientific or complex. *See Gigliobianco*, 210 S.W.3d at 641. We hold that the fifth factor also weighs in favor of admission.

## d. Likelihood of Undue Delay and Needless Repetition

*Gigliobianco*'s sixth factor concerns Rule 403's "fifth and sixth key phrases, 'undue delay' and 'needless presentation of cumulative evidence.'" *Id.* This factor focuses on how efficient the trial is, not on the risk of an erroneous verdict. *Id.* James complains that the extraneous-offense evidence "took up most of the trial" and that only three of the State's ten witnesses did not offer extraneous-offense evidence. He also complains that much of the extraneous-offense evidence was cumulative. He correctly contends that multiple witnesses testified about

- the January 21, 2018 incident in which he broke a door and his assault of Jane that same day;

- Jane's February 10, 2018 suicide attempt and later interaction with police; and

- the April 10 incident leading to James's arrest and the issuance of Jane's protective order against him.

The State acknowledges that its presentation of extraneous-offense evidence consumed a large portion of James's trial and that multiple witnesses testified about the same extraneous offense. The State concedes that this factor weighs in favor of exclusion of the evidence. We agree with the parties that it does.

## e. Resolution

Balancing all six factors, we hold that the trial court did not abuse its discretion by determining that the probative value of the extraneous-offense evidence was not substantially outweighed by the risk of "unfair prejudice, confusing the issues,

28

misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403, *see Flores*, 2020 WL 3887976, at \*5. Five out of the six *Gigliobianco* factors favor admission of the similar extraneous-offense evidence, and four of the six factors favor admission of the evidence of rape, sodomy, torture, and unlawful restraint. *See* 210 S.W.3d at 641–42. The probative value of the extraneous-offense evidence was high in that it rebutted James's fabrication defense, and the State's need for it was also high, both to rebut that defense and to shore up its own case in chief, given the attack on Jane's credibility, the absence of other witnesses to the charged offenses, and the absence of physical evidence of injury. James did not present any analysis showing that the evidence confused or misled the jury; the extraneous-offense evidence was not complicated. The similar extraneous-offense evidence was not unduly prejudicial, given its probative value, and even though the evidence of the extraneous offenses James emphasizes—rape, sodomy, torture, and unlawful restraint—certainly had the potential to sway the jury to improperly convict James based on character conformity, the trial court's limiting instructions sufficiently diminished that risk.

### 5. Propriety of Trial Court's Rule 403 Analysis

James further argues that even if the evidence was admissible, the trial court did not conduct the required balancing test. A trial court must conduct a balancing test upon a Rule 403 objection. *Santellan v. State*, 939 S.W.2d 155, 173 (Tex. Crim. App. 1997); *see Gigliobianco*, 210 S.W.3d at 641–42. However, a trial court is not required to perform the balancing test on the record, and when the record is silent, appellate

29

courts must presume that the trial court performed the appropriate balancing test before admitting the evidence. *Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997); *Jackson*, 424 S.W.3d at 155.

James argues that it was impossible for the trial court to conduct the test because virtually all the witnesses testifying about extraneous-offense evidence testified before Jane. However, defense counsel introduced the defensive theory of fabrication during voir dire, discussing witness credibility and a witness's motivation, before the preliminary hearing occurred. Further, the State argued in the preliminary hearing that the extraneous-offense evidence was relevant to show the couple's relationship, Jane's inability to leave, the power and control James had over her, and the danger the relationship represented for her. Finally, in the defense's opening statement, defense counsel indicated that the case was going to be about Jane's credibility. We therefore hold that nothing on the record defeats the presumption that the trial court conducted the proper Rule 403 balancing test before admitting the extraneous-offense evidence.

We overrule James's first issue.

### C. Qualification of Expert Witness and Relevance of Her Testimony

In his second issue, James complains that the trial court abused its discretion by allowing Kopsovich to testify as an expert about the cycle of violence because she was

unqualified and because her testimony about the cycle of violence was not relevant. He does not otherwise challenge her remaining testimony.[8]

## 1. Substantive Law

Rule 702 of the Texas Rules of Evidence governs the admissibility of expert testimony. That rule allows a witness who is "qualified as an expert by knowledge, skill, experience, training or education" to "testify in the form of an opinion or otherwise if [her] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. Hence, three conditions must be met before expert testimony is admitted: (1) the witness qualifies as an expert by reason of her knowledge, skill, experience, training, or education; (2) the testimony's subject matter is appropriate for expert testimony; and (3) admitting the expert testimony will aid the factfinder in deciding the case. *Rhomer*, 569 S.W.3d at 669. These conditions are commonly referred to as (1) qualification, (2) reliability, and (3) relevance. *Id.* James challenges qualification and

---

[8]Although James also objected at trial under Rule 403 and repeats the *Gigliobianco* factors within his discussion of this issue, he does not raise the Rule 403 complaint as part of his second issue on appeal. *See* Tex. R. App. P. 38.1(f). Specifically, he does not allege that the probative value of Kopsovich's testimony was substantially outweighed by a risk of undue prejudice, confusion of the issues, misleading the jury, undue delay, or the needless presentation of cumulative evidence, and he does not include any analysis or argument on the matter. To the extent his recitation of the law on Rule 403 was an attempt to raise the complaint, we overrule it as inadequately briefed. *See Jackson*, 424 S.W.3d at 155; *see also* Tex. R. App. P. 38.1(f), (i).

relevance but otherwise acknowledges that Texas courts have found expert testimony about domestic violence to be admissible under Rule 702.

## 2. Qualification of Expert

James argues that Kopsovich was not qualified to give expert testimony. Appellate courts rarely disturb a trial court's expert qualification decision. *Rodgers*, 205 S.W.3d at 528 n.9. "Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case." *Id.* at 527–28. A trial court does not abuse its discretion by allowing an expert witness to testify about domestic violence in general and the typical behaviors of victims of abuse even though the witness has no personal knowledge of the defendant and victim. *Nwaiwu v. State*, No. 02-17-00053-CR, 2018 WL 3763899, at *3 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication); *Scugoza v. State*, 949 S.W.2d 360, 363 (Tex. App.—San Antonio 1997, no pet.).

Our review of the record of the Rule 705 hearing pertaining to Kopsovich's qualifications shows that she:

- had never talked to Jane;

- had not testified as an expert in a trial before;

- did not review articles or other scholarly works before testifying;

- had never published works on domestic violence;

32

- had never counseled a victim of domestic violence but had advocated for them;

- had a master's degree in social work and was a licensed social worker;[9]

- currently supervised Safe Haven's clinical, crisis-and-outreach, and legal departments but rarely had one-on-one client contact in that position, which she had held for two years;

- was previously the director of Safe Haven's crisis-and-outreach department;

- had worked at Safe Haven for fifteen years, including directly with approximately 1,000 domestic-violence victims;

- had served in the following other positions at Safe Haven: government grant writer, shelter director, case management coordinator, house case manager, shelter case manager, and lead child advocate;

- had taught a "domestic violence 101" class to victims at Safe Haven;

- had participated in and facilitated many trainings;

- was currently teaching a graduate course on intimate partner violence;

- understood domestic violence, the cycle of violence, and the power-and-control wheel because of her experience; and

- could explain domestic-violence types and patterns, the cycle of violence, and the power-and-control wheel.

James argues that Kopsovich's lack of a psychology specialization as well as the items listed above that she had not done disqualify her from testifying as a domestic-violence expert. Given our review of the record, which demonstrates Kopsovich's training and experience and what she has accomplished in the domestic-violence field,

---

[9]Kopsovich clarified before the jury that she was a licensed master social worker.

we conclude that the trial court did not abuse its discretion by finding that she was qualified to offer expert testimony about domestic violence, including the cycle of violence and the power-and-control dynamic. *See Nwaiwu*, 2018 WL 3763899, at *3–4 (holding a licensed marriage and family therapist who worked with domestic-violence victims was qualified to give expert testimony on domestic violence, including the cycle of violence, and citing similar cases).

### 3. Relevance of Expert Testimony

James argues that Kopsovich's testimony about the cycle of violence was not relevant because the case was very straightforward, Jane cooperated with the State, she did not recant or reconcile with James, and she never testified that she had experienced the cycle of violence because she discussed no honeymoon period.

Before the jury, Kopsovich testified as follows about domestic violence, the cycle of violence, and the power-and-control wheel:

- Power and control are at the core of domestic violence.

- Abuse is a pattern of behavior rooted in power and control.

- Abuse can take many forms: emotional, verbal, sexual, financial, and spiritual are the most common.

- Abusers can use physical and sexual abuse but also coercion and threats, intimidation, isolation, minimizing, denial, blame, and male privilege to maintain power and control.

- The power-and-control wheel is a tool used to illustrate domestic violence.

- At the center of the wheel are power and control, and each spoke of the wheel represents a different type of abuse, but all have the same goal of exerting power and control.

- The cycle of violence consists of a circular pattern of three phases: tension building, explosion or violence, and honeymoon.

- The cycle repeats over time and can get faster.

- A complete cycle can occur in a day.

- The honeymoon phase may be absent from the cycle; the cycle may go back and forth between tension building and the explosion.

- Average national statistics show it takes a woman seven to nine times to permanently leave a relationship.

- Emotional abuse depletes victims' self-esteem.

- Isolation limits a victim's ability to leave the relationship.

- Homeless victims may stay in the relationship because they are dependent.

- Victims often feel hopeless after calling law enforcement.

- Victims often self-medicate with drugs and alcohol.

- It is common for victims to attempt suicide.

The testimony was relevant. The average juror will not typically be familiar with the effect of domestic violence on victims and the dynamics of the relationship between an abuser and victim. *See Fernandez*, 2020 WL 1057323, at *4; *Nwaiwu*, 2018 WL 3763899, at *3–4. The cycle of violence and the power-and-control wheel are generally accepted terms and tools that experts on domestic violence use to explain the general relationship between an abuser and victim. *See Fernandez*,

35

2020 WL 1057323, at \*4; *Nwaiwu*, 2018 WL 3763899, at \*3–4; *Runels v. State*, No. 03-18-00036-CR, 2018 WL 6381537, at \*7 (Tex. App.—Austin Dec. 6, 2018, pet. ref'd) (mem. op., not designated for publication).

James's arguments that the evidence is not relevant are unavailing. He cites no authority for the proposition that experts can testify about domestic violence only when the victims refuse to testify, recant, or reunite with their abusers. Further, our review of the record shows that the couple did experience the cycle of violence. Mary testified that Jane and James's relationship seemed pretty good at first, then they started not getting along, and then the abuse escalated. Jane testified that at first, she "[f]elt like [their relationship] was like a movie. In the beginning, [she] was really happy with him, and feelings grew really fast, and [she] really cared about him a lot." She testified that after the first physically abusive incident, she lied to the police because she cared about James and that she stayed in the relationship because she loved him. Thereafter, the abuse rose to a daily level. Although we agree with James that no evidence showed a traditional honeymoon phase following abuse—our review of the record showed no instance following abuse in which he apologized or gave her gifts or they reconnected—Kopsovich's testimony showed that that phase is not necessary to the cycle.[10]

---

[10]*Cf.* Kara Bellew, *Silent Suffering: Uncovering and Understanding Domestic Violence in Affluent Communities*, 26 Women's Rts. L. Rep. 39, 41 (2005) (noting research suggesting that in "upscale" domestic violence relationships, there is no honeymoon

36

Kopsovich's testimony was relevant to help the average juror understand the dynamics of the relationship between James and Jane (his controlling and isolating her and their homelessness and addiction), why Jane would stay in an abusive relationship, why she stole for James, why she left the crack house with him even though he had no weapon, why she stayed with him for two days after that instead of walking away, why she still stole a beer for James after asking a bystander to call the police, and why her first response when the police arrived in response to the bystander's call was to say she was fine. For all these reasons, the trial court did not abuse its discretion by allowing Kopsovich to testify. *See Nwaiwu*, 2018 WL 3763899, at *4. We overrule James's second issue.

### III. Conclusion

Having overruled James's two issues, we affirm the trial court's judgments.

/s/ Mike Wallach
Mike Wallach
Justice

Publish

Delivered: April 22, 2021

---

phase because "the affluent batterer tends to feel no regret or remorse [since] he perceives himself as the victim in every situation").